# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3982 | **DATE** | 12/12/2002 |
| **CASE TITLE** | Heartland Financial USA, Inc., et a vs. Financial Institutions Capital, et | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   ENTER MEMORANDUM OPINION AND ORDER: Defendant Gregory R. Miller's Motion to Dismiss is GRANTED and this case is DISMISSED in its entirety. The Court also hereby relinquishes supplemental jurisdiction over any remaining state law claims. All pending motions are denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| ✓ | Docketing to mail notices. | |
| ✓ | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

WAP

courtroom deputy's initials

number of notices

DEC 13 2002
date docketed

docketing deputy initials

date mailed notice

Document Number

28

U.S. DISTRICT COURT
CLERK

02 DEC 13 AM 8: 07

FILED

Date/time received in central Clerk's Office

mailing deputy initials

IN THE UNITED STATES DISTRICT COURT **FILED**
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DEC 1 2 2002

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

HEARTLAND FINANCIAL USA, INC.
and KEOKUK BANCSHARES, INC.,

          Plaintiffs,

     v.

FINANCIAL INSTITUTIONS CAPITAL
APPRECIATION PARTNERS I, L.P.,
CHICAGO CAPITAL, INC., CHICAGO
CAPITAL FUND MANAGEMENT,
L.L.C., STEPHEN J. KENNEDY,
and GREGORY R. MILLER,

          Defendants.

Case No. 02 CV 3982

Hon. Harry D. Leinenweber

**DOCKETED**

DEC 1 3 2002

## MEMORANDUM OPINION AND ORDER

Plaintiffs Heartland Financial USA, Inc. ("Heartland") and
Keokuk Bancshares, Inc. ("Keokuk") bring this complaint against
Defendants Financial Institutions Capital Appreciation Partners I,
L.P., a Delaware limited partnership ("FICAP"), Chicago Capital,
Inc., a NASD-registered broker-dealer ("Chicago Capital"), Chicago
Capital Fund Management, L.L.C., a Delaware limited liability
company ("Fund Management"), Stephen J. Kennedy ("Kennedy"), and
Gregory R. Miller ("Miller"), asserting federal claims under the
Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.
§§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17
C.F.R. § 240.10b-5 ("Rule 10b-5"), state law statutory claims under
the Illinois Securities Law of 1953, 815 ILCS 5/1 *et seq.*, the



Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, and the Iowa Uniform Securities Act, Iowa Code Ann. §§ 502.502-503, and state common law claims for fraud, breach of contract and breach of fiduciary duty. Presently before the Court is Miller's motion to dismiss the Complaint based on Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court grants the motion and dismisses this case in its entirety.

## BACKGROUND

On or about October 1, 1997, FICAP, through Chicago Capital, commenced a private placement offering of limited partnership interests. In connection with this offering, FICAP prepared a confidential private placement memorandum (the "PPM") and distributed it to all potential investors, including Plaintiffs, for their review prior to making an investment decision. The PPM states that FICAP's

> investment objective is to achieve capital appreciation by investing primarily in financial institutions (typically small and medium capitalization thrifts and banks and thrift and bank holding companies), insurance companies and nonbank financial services companies (including finance companies, mutual fund companies, collection companies and technology companies related to the financial services industry) that the General Partner believes are undervalued.

(PPM at 12.) The PPM further indicates that Fund Management "will serve as the General Partner of FICAP" and will make "[a]ll decisions with respect to the management of [FICAP]." (Id. at 23,

25.) Potential investors are warned that "[l]imited partners will have no right or power to take part in the management of [FICAP]." (Id. at 23.) The PPM represents that Miller, Kennedy and Thomas A. Lynch are "among the members of the General Partner and comprise the Investment Committee," and that, subject to the Investment Committee's oversight, Miller "will make the day-to-day trading decisions of [FICAP]." (PPM at 25; Compl. ¶ 25.)

In evaluating the FICAP investment opportunity, Plaintiffs contend that they looked beyond the information contained in the PPM, having allegedly received certain oral assurances from Kennedy and Miller. In particular, in the process of soliciting Plaintiff's investment, Kennedy allegedly "verbally confirmed to Plaintiffs that FICAP would invest only in financial institutions, insurance companies or financial services companies," an assurance Plaintiffs maintain was later repeated during a January 20, 1998 telephone conference call. (Compl. ¶ 20.) Plaintiffs also allege that Miller represented to them "in early 1998" that he "would be intricately [sic] involved in the management of FICAP and in the process by which FICAP would select investments." (Id. ¶ 24.)

Based on the PPM and the aforementioned alleged oral representations of Kennedy and Miller, Keokuk, a wholly-owned subsidiary of Heartland, elected to invest $1,000,000 in a FICAP limited partnership interest. (See Id. ¶¶ 23, 26-28.) In accordance with the subscription procedures set out in the PPM (see

PPM at 11), Keokuk formally consummated its investment in FICAP by executing on March 31, 1998 a series of documents, including an investor questionnaire, a subscription agreement (the "SA") and a limited partnership agreement (the "LPA"). (Compl. ¶¶ 26-27.) On April 1, 1998, Keokuk remitted its investment amount to FICAP via wire transfer. On May 3, 2001, Keokuk transferred its entire interest in FICAP to its parent company Heartland, described in the Complaint as "a diversified financial services holding company." (Id. ¶ 4.)

Plaintiffs claim that they were victims of what amounts to promissory fraud. In particular, Plaintiffs allege that "[c]ontrary to Miller's verbal representations, as well as the representations in the [PPM], Miller abandoned his day-to-day investment management responsibilities at FICAP to others in the autumn of 2000 to pursue other employment opportunities." (Compl. ¶ 29.) Moreover, Plaintiffs allege that "[i]n direct contravention of the FICAP investment program set forth in the [PPM] and touted by Miller and Kennedy, FICAP invested the majority of its funds in securities unrelated to the financial institutions and related securities as promised." (Id. ¶ 31.) For example, the Complaint indicates that between May 2000 and March 2001, FICAP invested $1,750,000 in the bridge loans of Recruiter Toolbox, Inc. ("Recruiter"), a now-bankrupt company that "specialized in creating on-line searchable database on global computer networks of

resumes." (Id. ¶ 32.) (Recruiter was evidently also an investment banking client of Chicago Capital (an affiliate of Fund Management), Chicago Capital was a shareholder in Recruiter, and Kennedy was a member of Recruiter's three-person board of directors.) (Id. ¶¶ 35, 36.) Plaintiffs conclude that FICAP's investment in Recruiter, as well as a $100,000 investment in the bridge loans of Answer-Me-Now, Inc. ("Answer-Me-Now") in May 2000, "did not comply with [FICAP's] investment program" as neither Recruiter nor Answer-Me Now was "a financial institution [or] an insurance company [or] a financial services company." (Id. ¶¶ 33, 44-45.) Both companies were "wholly unrelated to the financial services industry." (Pls.' Resp. to Def.'s Mot. to Dismiss at 3.)

On September 17, 2001 Kennedy allegedly conceded to Plaintiffs that "it was an error to invest in Recruiter Toolbox and, for the first time, provided a complete description of the investment and their losses." (Id. ¶ 48.) On or about November 30, 2001, Plaintiffs "wrote to Chicago Capital, care of Kennedy, and demanded the reimbursement of the full amount Plaintiffs lost on their FICAP investment, plus interest. Defendants have failed to comply with Plaintiffs' demand letter." (Id. ¶ 49.)

### STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether the plaintiff has properly stated a claim upon which relief could be granted, not whether the

plaintiff will ultimately prevail on the merits. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). In ruling on a motion to dismiss, a court must construe all well-pleaded allegations of the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *Id.* A motion to dismiss will not be granted unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

## DISCUSSION

### *Motion to Dismiss*

As a threshold matter, the parties disagree about which documents may be considered by the Court in connection with the instant motion to dismiss. Plaintiffs have attached a single exhibit to their Complaint - a copy of the PPM. "[A]ny written instrument which is an exhibit to a pleading is a part thereof for all purposes," FED.R.CIV.P. 10(c), and "the contents of any attached writing must be considered in determining the existence of a claim for relief or a defense on a motion to dismiss for insufficiency," 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1327 at 764 (2d Ed. 1990) [hereinafter "Wright & Miller"]. Accordingly, the Court has reviewed the substance of the PPM in connection with the instant motion to dismiss.

In his motion to dismiss, Miller himself has attached certain extra-pleading material, including the SA and the LPA. Plaintiffs

contend that the Court may not consider these documents for purposes of the pending motion for two reasons: (i) they were not formally included as part of the Complaint and (ii) Plaintiffs allegedly did not actually receive or review the text of either contract prior to executing them. Neither ground is convincing.

As to the first ground, "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Menominee Indian Tribe v. Thompson* 161 F.3d 449, 456 (7th Cir. 1998)(internal quotation marks excluded); *see also* Wright & Miller, § 1327 at 762-63 ("[W]hen [a] plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading."); *cf. Field v. Trump*, 850 F.2d 938, 949 (2d Cir. 1988)("In determining whether these [securities fraud] claims were properly dismissed under Rule 12(b)(6), we may of course refer to the Offer to Purchase and the 1984 Proxy Statement, which were annexed to defendants' motion to dismiss and are documents that are integral to plaintiff's claims."). Both the Complaint itself and the PPM attached to it (which, as previously explained, is considered a part of the Complaint for all purposes) make repeated reference to the SA and the LPA (*see, e.g.,* Compl. ¶¶ 26, 28; PPM at 1, 11, 33). And as will shortly become clear, these documents are central to –

and the LPA in particular is dispositive of - Plaintiffs' federal claims. In reviewing exhibits attached to a complaint, the Court

> is not bound to accept [a] pleader's
> allegations as to the effect of an exhibit,
> but can independently examine the document and
> form its own conclusions as to the proper
> construction and meaning to be given the
> material. When a disparity exists between the
> written instruments annexed to the pleadings
> and the allegations in the pleadings, the
> written instrument will control.

Wright & Miller, § 1327 at 766-67.

As to the second ground, "it is a fundamental principle of contract law that a person who signs a contract is presumed to know its terms and consents to be bound by them." *Paper Express, Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992) (*citing* 3 Arthur L. Corbin, *Corbin on Contracts* 607 (1989); 13 Samuel Williston, *Williston on Contracts* 1577 (1988)). "In fact, a blind or illiterate party (or simply one unfamiliar with the contract language) who signs the contract without learning of its contents would be bound. Mere ignorance will not relieve a party of her obligations and she will be bound by the terms of the agreement. . . . [A] party who agrees to terms in writing without understanding or investigating those terms does so at his own peril." *Paper Exp., Ltd.*, 972 F.2d at 757; *see also Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997) ("A contract need not be read to be effective; people who accept take the risk that the unread terms may in retrospect prove unwelcome.").

Although this fundamental rule is subject to a narrow exception in cases of fraudulent inducement,

> Illinois courts have consistently refused to extend the doctrine of fraudulent inducement to vitiate contracts where the complaining party could have discovered the fraud by reading the instrument and had the opportunity to do so. In such cases any reliance upon the claimed misrepresentation has been held to be unreasonable as a matter of law, so that the contract stands as written.

*Kolson v. Vembu*, 869 F.Supp. 1315, 1322 (N.D. Ill. 1994) (collecting cases); *Belleville Nat. Bank v. Rose*, 456 N.E.2d 281, 284 (Ill. App. 1983)(The "law is that a party who signs an instrument relying upon representations as to its contents when he has had an opportunity to ascertain the truth by reading the instrument and has not availed himself of the opportunity, cannot be heard to say that he was deceived by misrepresentations." (internal quotation marks omitted)). Indeed, it is an "elementary principle of contract law" that "[o]ne is under a duty to learn, or know, the contents of a written contract before he signs it, and is under a duty to determine the obligations which he undertakes by the execution of a written agreement." *Belleville Nat. Bank*, 456 N.E.2d at 284 (internal quotation marks omitted).

As will soon be discussed in greater detail, a review of the governing LPA would easily have revealed to Plaintiffs the purportedly fraudulent nature of the pre-contractual oral and written representations upon which Plaintiffs claim to have relied

in making their investment decision, and Plaintiffs do not contend otherwise. Neither is there any allegation that Plaintiffs did not have an opportunity to read the LPA (or, for that matter, any of the other subscription documents). Plaintiffs merely claim that in their haste to meet the April 1, 1998 investment deadline, they agreed to execute just signature pages and to take receipt of "complete copies of the investor questionnaire, subscription agreement and limited partnership agreement . . . the next day." (Compl. ¶ 26.) Plaintiffs did so in the face of the PPM's specific warning that it

> contains summaries, believed to be accurate, of certain terms of certain documents, but reference is hereby made to the actual documents (copies of which are annexed hereto or will be made available to prospective investors upon request) for complete information concerning the rights and obligations of the parties thereto and all such summaries are qualified in their entirety by this reference.

(PPM at ii.) At a later point in the PPM, all prospective limited partners are expressly admonished to "carefully read the [LPA] in its entirety" because "[t]o the extent there are any inconsistencies [between the PPM and the LPA], the [LPA] will control." (PPM at 33.) Plaintiffs are each sophisticated parties (Compl. ¶ 4) and apparently chose not to demand an opportunity to read what they were signing; in the words of Judge Posner in *United States v. Stump Home Specialties Mfg., Inc.*, 905 F.2d 1117, 1120 (7th Cir. 1990), "that is their tough luck."

- 10 -

### *Federal Securities Fraud Claims*

### *Section 10(b) and Rule 10b-5*

Section 10(b) of the Exchange Act makes it unlawful "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . ." 15 U.S.C. § 78j(b). Pursuant to its statutory authority, the SEC has promulgated Rule 10b-5 which provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device scheme or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. "In general, to prevail on a Rule 10b-5 claim, a plaintiff must prove that the defendant: 1) made a misstatement or omission, 2) of material fact, 3) with scienter, 4) in connection with the purchase or sale of securities, 5) upon which the plaintiff relied, and 6) that reliance proximately caused

the plaintiff's injury." *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995). It follows, then, that "without reliance [a plaintiff] has no claim under § 10(b) or Rule 10b-5." *Rissman v. Rissman*, 213 F.3d 381, 383 (7th Cir. 2000); *see also One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283, 1286 (D.C. Cir. 1988)("To state a claim of fraud or securities fraud upon which relief can be granted, plaintiffs' allegations must indicate that their reliance on the allegedly fraudulent representations was reasonable.")

### No-Reliance Clause

The LPA contains both an "integration" clause and a "no-reliance" clause. The integration clause reads: "This [LPA] contains the entire agreement among the parties and supersedes any prior agreement or understanding, oral or written, relating to [FICAP]." (PPM § 14.10.) The no-reliance clause provides: "Each Limited Partner hereby represents and warrants to and agrees with [FICAP] and the General Partner as follows: no representations or warranties have been made to the Limited Partner by the General Partner or agent thereof other than as set forth in this [LPA]." (PPM § 13.2(g).) Each investor who signed the LPA specifically represented that it had "received, read and understood" the LPA. (PPM § 13.2(e).)

Plaintiffs do not contend that anything in the LPA (or any other subscription documents) is false or misleading. Indeed, this

would be quite impossible based on the allegations in the Complaint, since the LPA makes it clear beyond peradventure that the General Partner of FICAP would be unrestricted in its choice of both security type and issuer type in making investments.   For example, the LPA states that FICAP's organizational purpose is, inter alia, to:   (i) "invest and trade, on margin or otherwise, in Securities, to sell Securities short and cover such sales" (LPA § 1.1(a));   (ii) "purchase, hold, sell, exchange, transfer, mortgage, pledge and otherwise acquire and dispose of and exercise all rights, powers and privileges and other incidents of ownership, or possession with respect to Securities" (LPA § 1.1(b)(i)); and (iii) "purchase and hold Securities for investment."   The LPA vests plenary power in the General Partner to carry out these purposes. (*See* LPA § 4.4.)   Critically, the LPA defines "Securities" in the most capacious terms imaginable, as follows:

> Securities **of every kind and nature**, including, without limitation, equities, bonds, notes, debentures, trust receipts, financial futures contracts, securities of foreign issuers (including American Depositary Receipts), repurchase agreements, derivatives and [sic] **of any Partner, corporation, government or entity**, whether readily marketable or not, and rights and options relating thereto, including put and call options written by [FICAP] or by others.

(LPA §2.28 (emphasis supplied)).   Even the PPM itself alerts potential investors to the breadth of this definition, stating that "the [LPA] authorizes [FICAP] to invest in **all types of securities**

- 13 -

and other financial instruments of **any entity** and to sell
securities short and cover such sales. The term 'securities', as
used herein, is given its broadest possible meaning. . . ." (PPM
at 31 (emphasis supplied).)

Moreover, the LPA contains no representations whatsoever about
the scope, duration or even existence of Miller's personal
participation in the management, affairs or investment decision-
making of FICAP. The LPA simply identifies Fund Management as
FICAP's General Partner, sets out its powers and responsibilities,
and leaves matters at that. (*See, e.g.,* LPA preamble and §§ 2.14,
4.1, 4.2 and 4.4.)

Rather, Plaintiffs entire case rests on statements contained
in the PPM and allegedly communicated orally by Miller and Kennedy.
Yet, just as in *Rissman*, Plaintiffs "assured [Defendants] that
[they] had not relied on these statements." *Rissman*, 213 F.3d at
383. "Securities law does not permit a party to a stock
transaction to disavow such representations - to say, in effect, 'I
lied when I told you I wasn't relying on your prior statements' and
then to seek damages for their contents." *Id.* In *Rissman,* the
Seventh Circuit explicitly held that "a written anti-reliance
clause precludes any claim of deceit by prior representations."
*Id.* at 384; *see also Vigortone AG Products, Inc. v. PM AG Products,
Inc.*, 2002 WL 31466526, at *3 (7th Cir. Nov. 6, 2002)(citations
omitted)("[P]arties to contracts who do want to head off the

possibility of a fraud suit will sometimes insert a 'no-reliance' clause into their contract, stating that neither party has relied on any representations made by the other.  Since reliance is an element of fraud, the clause, if upheld - and why should it not be upheld, at least when the contract is between sophisticated commercial enterprises - precludes a fraud suit. . . .") Accordingly, to the extent Plaintiffs relied on any representations outside of the LPA in making their investment in FICAP, it was unreasonable as a matter of law to have done so.

### Failures to Disclose

As a final matter, construing the Complaint generously, Plaintiffs appear also to claim that the Defendants committed federal securities fraud by allegedly failing to make certain post-investment disclosures regarding, inter alia:  (i) the existence of the investment banking relationship between Chicago Capital (an affiliate of Fund Management) and Recruiter; (ii) Chicago Capital's status as a shareholder of Recruiter and Kennedy's membership on Recruiter's board of directors; and (iii) the "dire straits of FICAP's investments in [Recruiter] and Answer-Me-Now, and that Defendants were taking no steps to protect FICAP's investments in [Recruiter] and Answer-Me-Now."  (Compl. ¶ 51).  Even assuming these omissions were material, each occurred long after Plaintiff's investment in FICAP, and therefore none occurred "in connection with the purchase or sale of securities."  *Stransky*, 51 F.3d at

1331; *see Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737-38 (1975)(Rule 10b-5 proscribes only fraud in connection with the purchase or sale of securities); *Craig v. First Am. Capital Res., Inc.*, 740 F.Supp. 530, 535 (N.D. Ill. 1990)("To satisfy the 'in connection with' language of § 10(b) and Rule 10b-5, a plaintiff must show a causal connection between his decision to buy or sell securities and the defendant's fraudulent conduct."); *cf. Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992)(holding in fraud-on-the-market case that "post-purchase statements cannot form the basis of Rule 10b-5 liability, because the statements could not have affected the price at which plaintiff actually purchased."). Accordingly, none of the aforementioned alleged omissions are actionable under Section 10(b) or Rule 10b-5.

### Section 20(a)

The Plaintiffs have also alleged controlling-person liability against all of the Defendants under Section 20(a) of the Exchange Act. Section 20(a) provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

- 16 -

15 U.S.C. § 78t(a). A claim for recovery under Section 20(a) is merely a derivative claim, cognizable only where plaintiffs sufficiently allege a "primary" violation of Section 10(b) and Rule 10b-5. *In re Allied Products Corp. Secs. Litig.*, 2000 WL 1721042, at *2 (N.D. Ill. Nov. 15, 2000). Because Plaintiffs have failed to state a claim for a primary violation of Section 10(b) and Rule 10b-5, the Court hereby also dismisses all of the Plaintiff's Section 20(a) claims.

### CONCLUSION

For the foregoing reasons, Defendant Gregory R. Miller's Motion to Dismiss is **GRANTED** and this case is **DISMISSED** in its entirety. The Court also hereby relinquishes supplemental jurisdiction under 28 U.S.C. § 1367 over any remaining state law claims. All pending motions are **DENIED** as moot.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Date: _December 12 2002_

# United States District Court
## Northern District of Illinois
### Eastern Division

Heartland Financial USA, Inc., et al

v.

Financial Institutions Capital, et al.

**JUDGMENT IN A CIVIL CASE**

Case Number: 02 C 3982

☐ Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

☒ Decision by Court. This action came before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that the Motion by Defendant Gregory R. Miller's Motion to Dismiss is GRANTED and this case is dismissed in its entirety.

Michael W. Dobbins, Clerk of Court

Date: 12/12/2002

Wanda Parker, Deputy Clerk